JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellants Lorraine DeMeo, executrix of the estate of C. Frank DeMeo, ("Frank DeMeo") and General Casting Company ("GCC") (referred to collectively as "plaintiffs-appellants") appeal the trial court's decision granting summary judgment to McDonald, Hopkins, Burke Haber Co., L.P.A. ("McDonald Hopkins"). They assign the following errors for our review:
 "I. The trial court erred in granting defendant-appellee McDonald Hopkins's motion for summary judgment on appellants' claim for professional negligence despite numerous disputed material facts precluding such judgment and despite two expert reports that unambiguously concluded McDonald Hopkins breached its duty of care causing appellants' damage."
 "II. The trial court erred in granting summary judgment dismissing appellant Lorraine DeMeo's professional negligence claim based upon McDonald Hopkins's statute of limitations defense."
 "III. The trial court erred by denying appellants' Rule 37 motion to compel McDonald Hopkins to identify its attorneys and the files they worked on for Provident Bank, when it is undisputed that McDonald Hopkins was concurrently representing appellants and Provident Bank."
 "IV. The trial court erred by denying appellants' Rule 37 motion to compel non-party National City Bank (as successor to the Provident Bank) to produce documents identifying the attorney at McDonald Hopkins who represented Provident Bank, and to identify the files on which those attorneys worked, when it is undisputed that McDonald Hopkins was concurrently representing appellants and Provident Bank."
 "V. The trial court erred in granting summary judgment, dismissing plaintiffs' breach of fiduciary duty claims based upon McDonald Hopkins's argument they are `subsumed' by plaintiffs' legal malpractice claims." *Page 4 "VI. The trial court erred by granting McDonald Hopkins's motion for partial judgment on the pleadings."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 Factual Background {¶ 3} The trial court granted McDonald Hopkins's motion for summary judgment, wherein McDonald Hopkins claims it had an oral and written waiver of any conflict of interest; and the plaintiffs-appellants did not point to any admissible evidence in the record that would support their claim for legal malpractice. Finally, McDonald Hopkins argued that the self-serving accusations of legal malpractice must fail because plaintiffs-appellants' witnesses, in-house counsel, Geoffrey Lamb and CFO Frank Johnson did not support any of the plaintiffs-appellants' claims. It also argued that Lorraine DeMeo's claims are time barred and none of the plaintiffs-appellants have standing to assert a claim for legal malpractice.
 {¶ 4} Plaintiffs-appellants countered in their opposition to the motion that they did not know until after August 9, 2002, that McDonald Hopkins represented them and Provident Bank. They primarily claim that after the 2001 loan restructuring with Provident Bank, Frank DeMeo was exposed to $6 million in personal liability and GCC had a diminished ability to borrow from Provident Bank. Plaintiffs-appellants alleged that McDonald Hopkins committed legal malpractice because it failed to fully *Page 5 
disclose the conflict of interest and no waiver of the conflict existed between them and McDonald Hopkins; additionally, they were never told about the change in the eligible accounts nor were they fully aware of the estate planning consequences as it related to the 2001 loan. Consequently, the refinancing of the loan and the estate planning advice resulted in their damages.
 {¶ 5} It is undisputed that McDonald Hopkins represented both GCC and Provident Bank in 2001 during the loan restructuring between GCC and Provident Bank. McDonald Hopkins represented GCC until sometime in 2002. It is also undisputed that Frank DeMeo was the sole owner of GCC, of which Frank Johnson acted as CFO and accounting manager and DeMeo's son-in-law, Geoffrey Lamb, was in-house general counsel for GCC.
 {¶ 6} In August 2002, Provident Bank sued Frank and Lorraine DeMeo for fraudulent conveyance. In July 2003, Frank DeMeo and GCC sued Provident Bank for lender liability, fraud, breach of contract, and breach of fiduciary duty; they also sued McDonald Hopkins for legal malpractice. In September 2003, Frank DeMeo committed suicide, and Lorraine DeMeo intervened in the lawsuits on behalf of the estate and also amended the complaint to include intentional infliction of emotional distress, loss of consortium, and wrongful death. Ultimately, Lorraine DeMeo and Provident Bank settled their claims; Provident Bank is not a party to this appeal. On *Page 6 
September 26, 2006, McDonald Hopkins moved for summary judgment, which the trial court granted.
 Conflict of Interest {¶ 7} It is undisputed that McDonald Hopkins did not obtain a written waiver signed by Frank DeMeo. Carl Grassi, the managing partner of McDonald Hopkins, testified at his deposition that when the firm was retained to represent GCC in the final stages of the March 2001 loan restructuring, he disclosed to Frank DeMeo that Provident Bank's Cleveland office was a client of McDonald Hopkins. Grassi testified that he obtained an oral waiver from Frank DeMeo regarding any potential conflict of interest.
 {¶ 8} Grassi further testified that in December 2001, after GCC's account was sent to collections at Provident Bank's Columbus office, he obtained a written waiver from Frank DeMeo. Grassi stated that he thought the written waiver had become necessary because of the adversarial nature of collections and McDonald Hopkins had not previously represented Provident Bank's Columbus office.
 {¶ 9} The record before us includes a written waiver, dated December 17, 2001, addressed to Frank DeMeo. Paragraph two of the waiver reads in pertinent part as follows:
 "* * * As you are already aware, McDonald Hopkins represents Provident with respect to certain transactions. Because of our prior and continuing representation of Provident, our *Page 7 representation of General Casting in this matter creates a potential conflict of interest because of the possibility that General Casting's interest and Provident's interest may become adverse.
This paragraph uses the language "as you are already aware," which suggests that Frank DeMeo had knowledge of the dual representation. The record also shows that Geoffrey Lamb, GCC's general counsel, signed the above waiver, thus attesting to the GCC's understanding of the matter, and also signifying prior knowledge of McDonald Hopkins's relationship with Provident Bank.
 {¶ 10} In addition, Provident Bank's loan officer assigned to GCC's account, Michael Giulioli, testified that Frank DeMeo was aware of McDonald Hopkins's prior and continuing representation of Provident Bank in various unrelated matters. Giulioli also testified that the law firm of Arter and Hadden represented both Provident Bank and GCC regarding the 1997 and 1998 amendments to the original loan.
 {¶ 11} Kevin Kessinger was the lawyer from McDonald Hopkins primarily assigned to represent GCC in the 2001 loan restructuring with Provident Bank. Kevin Kessinger testified that Frank DeMeo was aware of McDonald Hopkins's prior involvement with Provident Bank and actually viewed it in a favorable light. Kessinger testified in pertinent part as follows:
 "Q. What was your understanding of that conflict of interest if any?
 "A. We had represented Provident Bank on other loan transactions and I recalled that Frank DeMeo was aware of that. I don't *Page 9 remember anything further as to what conflict waivers were or were not sent.
 "Q. How did you become aware that Mr. DeMeo was aware of McDonald Hopkins's previous representation of Provident Bank?
 "A. Because at times Frank DeMeo would ask me to ask Carl to reach out to his contacts at Provident Bank to try to help him on this transaction.
 "Q. On the March 2001 transaction?
 "A. On the March 2001 transaction."[1]
 GCC's Loans {¶ 12} In 1996, Provident Bank, GCC, and Frank DeMeo entered into an asset based loan secured by GCC's accounts receivable and inventory. If the invoice was more than 120 days old, it was not an eligible account for purposes of the loan repayment. Section 1.7 of that loan provided that the criteria for eligibility was fixed and revision was solely within Provident Bank's discretion and "exclusive judgment."[2]
Provident Bank also held exclusive discretion to allow over-advances to GCC.
 {¶ 13} In 1997, the parties restructured the loan and specifically omitted the right of GCC to draw on over-advanced notes. The other provisions were the same as the 1996 loan. *Page 9 
 {¶ 14} In 1998, Provident Bank extended the loan amount from $9.2 million to $10 million. In neither of these agreements was GCC to receive over-advances.
 {¶ 15} By 1999, GCC's operation consisted of eight foundry plants and annual sales exceeding $85 million. By 1999, GCC's outstanding loans with Provident Bank totaled more than $17.5 million. By the end of 1999, GCC's sales began to decline.
 {¶ 16} By spring of 2000, GCC was in default with Provident Bank. GCC requested that Provident Bank allow it to remain in default without calling the loan. Provident Bank agreed, and the parties began negotiating the restructuring of the original loan. By the end of 2000, GCC's sales had declined from a high of $85 million to $65 million. GCC needed additional funding to support the business through the market downturn, while Provident Bank wanted to lower its risk of loss by providing a smaller loan.
 {¶ 17} In June 2000, in order to assess GCC's credit and financial condition, Provident Bank hired Barber Mooney Consultants, CPAs, Inc. ("Barber and Mooney") to perform an asset based loan analysis and prepare an audit of GCC's account. On July 17, 2000, Barber and Mooney issued an asset-based lending examination report to Provident Bank. In the report, Barber and Mooney recommended that GCC's accounts receivables, with invoices that were more that 90 days old, not be considered "eligible accounts" for purpose of the loan. This *Page 10 
recommendation altered the definition of "eligible accounts." An eligible account would be changed from invoices no more than 120 days old to invoices no more than 90 days old.
 {¶ 18} As a result of the Barber and Mooney report, Provident Bank requested that Frank DeMeo make a subordinated loan of $3 million of his personal funds to GCC. In addition, Provident Bank required that Frank DeMeo also sign a personal guaranty for another $3 million in order to obtain the restructured financing.
 {¶ 19} In order to fund the $3 million subordinated loan to GCC, Frank DeMeo borrowed $1.7 million from Horizon Capital Properties, which leased certain buildings to GCC; it was wholly owned by Frank DeMeo and his children. Frank DeMeo also borrowed $1.3 million from Commerce Exchange Bank, secured by his personal brokerage account at Fifth Third / Maxus Securities, Inc. Frank DeMeo paid the proceeds of both loans to GCC to fulfill Provident Bank's requirements for obtaining the 2001 restructured loan.
 {¶ 20} The record indicates that on or about March 8, 2001, GCC retained the law firm of McDonald Hopkins to represent them in the final stages of negotiating the restructured loan financing. This occurred after the Barber and Mooney report and after negotiations had occurred between Frank DeMeo and Provident Bank's agent, Michael Giulioli. On March 23, 2001, GCC and Provident Bank executed the restructured loan financing agreement. Under the agreement, Provident Bank *Page 11 
loaned GCC $8 million in exchange for a term promissory note. In addition, GCC executed a revolving credit note payable to Provident Bank in the principal amount of $8.5 million.
 {¶ 21} The restructured loan agreement required GCC to make 84 consecutive monthly installments of $83,333, beginning May 1, 2001. The record indicates that GCC's financial condition continued to deteriorate, and GCC was approximately $2 million past due on its scheduled repayment of the loan. Provident Bank allowed GCC to operate despite being in arrears. In December 2001, Provident Bank transferred GCC's account to its collection or "workout" department in Cincinnati to attempt to collect the monies owed.
 {¶ 22} During its collection efforts, Provident Bank contacted Frank DeMeo to discuss payment of GCC's note and Frank DeMeo's personal note. Frank DeMeo promised to pay and represented that he held a 50% ownership interest in his personal residence located in Hunting Valley, Ohio. Frank DeMeo also represented that the Hunting Valley residence had a fair market value of approximately $2 million. In addition, Frank DeMeo represented that he held a 50% interest in a condominium located in Naples, Florida.
 {¶ 23} Acting on Frank DeMeo's representations, Provident Bank agreed to forestall legal proceedings for 90 days. As part of the proposed forbearance, Provident Bank required Frank DeMeo to submit a current personal financial *Page 12 
statement. On April 31, 2002, Frank DeMeo provided a certified personal financial condition statement representing that as of March 31, 2002, he held a 50% interest in both his Hunting Valley residence and his Naples condominium.
 {¶ 24} On June 14, 2002, Frank DeMeo, GCC, and Provident Bank entered into a forbearance agreement. Under the agreement, Provident Bank agreed to forbear exercising its default rights against Frank DeMeo and GCC, in order to allow GCC to maximize the value of Provident Bank's collateral through a plan of liquidation.
 {¶ 25} In addition, the forbearance agreement required Frank DeMeo to execute mortgages in favor of Provident Bank with respect to his interest in both the Hunting Valley and Naples properties. After the forbearance agreement was executed, Frank DeMeo refused to execute the required mortgages in Provident Bank's favor. Subsequently, Frank DeMeo asserted that he had no ownership interest in either property.
 {¶ 26} In July 2002, Provident Bank discovered that on November 21, 2001, prior to making the representation, Frank DeMeo had transferred his ownership interest in both properties to his wife, Lorraine DeMeo. On August 14, 2002, Provident Bank filed suit against Frank and Lorraine DeMeo.
 Witnesses Regarding 2001 Loan Agreement *Page 13 {¶ 27} Frank Johnson testified that he was responsible for preparing the financial reports and analyzing the proposed financial terms to determine whether GCC could comply with the financial covenants and definitions as proposed by Provident Bank. Johnson testified that several financing scenarios were proposed by either side and analyzed against the current business forecasts.
 {¶ 28} Michael Giulioli, the Provident Bank loan officer assigned to GCC's account, testified that Barber and Mooney performed an asset-based loan analysis and an audit of the GCC account at the request of Provident Bank. Giulioli testified that Barber and Mooney issued a report recommending that accounts receivable with invoices older than 90 days be deemed ineligible.
 {¶ 29} Giulioli testified that he had several conversations with Frank DeMeo wherein he explained the asset-based loan analysis and audit examination results. Giulioli also testified that he explained to Frank DeMeo, Barber and Mooney's recommendations regarding the changes to the eligible accounts from 120 days to 90 days. Giulioli testified that one of the conversations took place at GCC's Powell, Ohio office.[3]
 {¶ 30} Giulioli further testified that Provident Bank became inflexible about changing Barber and Mooney's recommendation regarding the eligible accounts. *Page 14 
Giulioli testified that on January 31, 2001, Provident Bank prepared a draft of the revised credit facility, which contained the revised definition of an eligible account, and forwarded it to GCC.
 {¶ 31} Johnson testified that he reviewed the January 31, 2001 draft Giulioli had forwarded, which contained the definition of "eligible accounts." Johnson testified in pertinent part as follows:
 "Q. Mr. Johnson, you've been handed what's been marked as Exhibit 33, which is a draft of the amended and restated loan and security agreement, which reflects a date of January 31, 2001. Do you see that?
 A. Yes.
 Q. Do you know if you ever saw a draft of this document with the date January 31, 2001?
 A. I don't recall the specific date, but I would have — I would have expected to have seen a draft of this document at some point in the process.
 Q. Now, this draft of the amended and restated loan agreement at Page 3 has a definition of eligible account correct?
 A. Yes.
 Q. And the Subparagraph H indicates a time period of 90 days from the date of invoice, correct?
 A. Yes.
 Q. And that was a change from the prior loan agreement, correct? *Page 15 
 A. Yes.
 Q. Do you recall seeing that provision in the drafts of this agreement?
 A. Not specifically because this is a point of contention.
 Q. You do recall, however, reviewing drafts of the —-
 A. Yes.
 Q. — amended and restated loan agreement?
 A. Yes.
 Q. Before it was finalized?
 A. Yes.
 Q. And would you have reviewed the definitions of eligible account?
 A. Yes.
 Q. And you would have reviewed the financial covenants?
 A. Yes."[4]
 {¶ 32} In addition, Kessinger testified that he compared the 1996 loan agreement with the March 23, 2001, proposed loan agreement and discussed the changes with Frank DeMeo. Kessinger testified that he had several conversations with Frank DeMeo about GCC's borrowing base statistics or percentages. *Page 16 
Kessinger testified that he recalled going through various portions of the definition of eligible accounts on the phone with Frank Johnson and Frank DeMeo. During this conversation, Frank DeMeo identified certain GCC customers which he thought might be ineligible under the revised definition, and asked Johnson to confirm whether or not those customers were going to be ineligible.
 {¶ 33} Kessinger testified in pertinent part as follows:
 "Q. Other than discussions of particular ineligible customers did you have any other conversations with General Casting regarding the borrowing base?
 A. I remember there was, in the borrowing base, a concept at the end of the definition that allowed the bank to effectively kick out accounts if in the bank's discretion or something to that effect. It wasn't a good credit risk in asking Frank DeMeo whether we should try to get that concept eliminated.
 Q. Do you recall his response or anyone's response?
 A. I remember him saying he didn't know what choice he had with that but we should try.
 Q. Did he say to you that this proposed refinancing transaction was necessary for the financial health of General Casting Company?
 A. He said on a number of occasions that he needed this refinancing and he didn't have a choice."[5]
 {¶ 34} Further, the record before us reveals that on March 16, 2001, Kessinger
sent an e-mail to Johnson, to GCC's financial advisor, Jay Bagdasarian, to GCC's *Page 17 
general counsel, Geoffrey Lamb, and to Frank DeMeo. In the e-mail, Kessinger specifically asked GCC to review the financial covenants and definitions of the restated loan agreement and to propose any changes.
 {¶ 35} Johnson testified that he and Frank DeMeo reviewed the various drafts of the loan agreements. The record before us reveals that drafts contained changes to the definition of an "eligible account." GCC had a duty to review and analyze the impact the changed definition of an "eligible account" in the proposed agreement would have on GCC's operating ability.
 {¶ 36} Finally, Johnson testified that the required analysis was not a legal analysis, but an operational and accounting analysis.[6] Johnson stated that Kessinger would have needed the input of GCC to determine whether the percentages associated with the net value of eligible accounts were satisfactory.[7]
 Summary Judgment {¶ 37} The trial court granted summary judgment and the plaintiffs-appellants appealed. In the first assigned error, which we find dispositive of the instant appeal, Lorraine DeMeo and GCC argue the trial court erred by granting summary judgment in favor of McDonald Hopkins on their claim of legal malpractice. We disagree. *Page 18 
 {¶ 38} We review an appeal from summary judgment under a de novo standard of review.[8] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[9] Under Civ. R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion, which is adverse to the nonmoving party.[10]
 {¶ 39} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[11] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the non-movant fails to establish the existence of a genuine issue of material fact.[12]
 {¶ 40} We disagree with the plaintiffs-appellants that a factual question exists *Page 19 
as to whether McDonald Hopkins breached its duty of care with GCC and Frank DeMeo. It is undisputed that GCC was owned by Frank DeMeo. Frank DeMeo was the principal seeking legal representation from McDonald Hopkins for his company, which was declining in profits and needed financial capital.
 {¶ 41} Plaintiffs-appellants argue that McDonald Hopkins breached its duty of care because it represented Frank DeMeo and Provident Bank during the same time frame.
 {¶ 42} "Every client is entitled to the undivided fidelity of his attorney if he so elects."[13] DR 5-105(B) in part states, "[a] lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted * * *."
 {¶ 43} Under DR 5-105(C), an attorney may accept or continue employment by two or more clients having potentially competing interests only if (1) it is "obvious" that all the clients' interests can be represented adequately by a single attorney, (2) all the clients have been fully informed as to possible conflicts, and (3) all the clients have knowingly consented to the multiple representation. Moreover, mere notice to clients is not sufficient to avoid such charges of misconduct. Rather, "it [is] incumbent upon [an attorney] to advise those clients possessing competing interests *Page 20 
of any potentially adverse effects which might cause [the attorney] to support for one client what his professional duty for the other required him to oppose."[14] The ethical rules and case law permit this ethical obligation to be waived if the client chooses to do so.
 {¶ 44} In Northwestern Life Ins. Co. v. Rogers,[15] cited by the plaintiffs-appellants, the court recognized that negligence per se does not exist for violation of ethical rules. However, violation of the ethical rules may sustain a claim for malpractice, when supported by expert testimony. Expert testimony would be required to support the allegations except where it is so patently obvious that a violation occurred.[16]
 {¶ 45} This case is devoid of any evidence of a violation of the ethical rules regarding conflict of interest. In fact, McDonald Hopkins did not deny that it had a relationship with Provident Bank. The managing partner explained that after beginning its representation of GCC and DeMeo, he obtained an oral waiver from DeMeo regarding any conflict of interest. Then months later, he sent a written waiver to DeMeo at GCC and reminded him of the conflict and asked for a written waiver. The letter was specifically addressed to Frank DeMeo and was returned to *Page 21 
McDonald Hopkins signed by GCC's general counsel, Frank DeMeo's son-in-law, Geoffrey Lamb. Consequently, on this issue, plaintiffs-appellants have failed to present a fact issue for trial.
 {¶ 46} Nevertheless, plaintiffs-appellants and their experts argue this attempt at a waiver is insufficient and their expert maintains that any waiver by Frank DeMeo should have been in writing. We agree that the better practice is a written waiver; however, the absence of a written waiver does not negate the oral waiver. McDonald Hopkins points to the record and establishes the absence of any evidence to counter their understanding of both the written and oral waiver.
 {¶ 47} The sad and unfortunate point of this case is that Frank DeMeo died in September 2003 and nothing exists in the record to show that he did not waive the conflict. In fact, the evidence establishes that not only did he know of the relationship between McDonald Hopkins and Provident Bank, but he wanted to benefit from the relationship by urging the managing partner, Grassi, to use his leverage to encourage Provident Bank to approve the 2001 loan.
 {¶ 48} In terms of the sufficiency argument, the letter from Grassi and Frank DeMeo, although not signed by Frank DeMeo but only by his lawyer, states that the Bank and GCC's interest might become adverse; consequently, this evidence adequately fulfills the lawyer's burden of informing his client of the potential of a conflict of interest. *Page 22 
 {¶ 49} Finally, plaintiffs-appellants argue that even though this conflict of interest issue might not be per se negligence, it is evidence of a breach of duty. Because the conflict of interest issue is commingled with the other issues regarding a breach of duty, we will discuss them together. In order to establish legal malpractice, plaintiffs-appellants must show a duty, a breach of that duty, and damages proximately caused by the breach.[17]
 {¶ 50} It is undisputed that McDonald Hopkins owed a duty of care to the plaintiffs-appellants. The question is whether there existed a breach of that duty and damages proximately caused by McDonald Hopkins's conduct. Plaintiffs-appellants argue that the failure to obtain a waiver of the conflict of interest constituted evidence of a breach of duty. Additionally, they argue that McDonald Hopkins's failure to discover, inform, and explain to Frank DeMeo, GCC, and their representatives that the eligible accounts had changed from 120 days to 90 days is a breach of duty. Further, the plaintiffs-appellants claim that McDonald Hopkins's representation of Frank and Lorraine DeMeo regarding the estate planning and the Horizon lease constituted a breach of duty.
 {¶ 51} In order for McDonald Hopkins to receive summary judgment in this case, no genuine issue of material fact must exist. We note at the outset that this is *Page 23 
not the traditional legal malpractice "case within a case" lawsuit. The plaintiffs-appellants sought legal assistance with a loan agreement and now claim the advice on the loan caused them damages.
 {¶ 52} Frank DeMeo and GCC got what they wanted from Provident Bank, a restructured loan in 2001, which had been restructured on other occasions between 1997 to 2000. McDonald Hopkins appeared to service the plaintiffs-appellants in the loan restructure because GCC received a $16.5 million loan package in 2001. However, six months later, GCC was in default again. Provident Bank called the loan and sued Frank and Lorraine DeMeo for fraudulent conveyance.
 {¶ 53} Consequently, a single attorney represented GCC's interest and GCC did obtain the loan. GCC and DeMeo were informed of the conflict and waived it both orally and in writing. It appears from the record that all the parties consented to the multiple representations. In fact, the record suggests DeMeo encouraged the multiple representation.
 {¶ 54} Plaintiffs-appellants also argue that McDonald Hopkins breached its duty when it failed to disclose, inform, or explain the change in the eligible accounts from 120 days to 90 days. The record does not support this allegation; accordingly, no question of fact exists. Kevin Kessinger, Michael Guilioli, Frank Johnson, and Geoffrey Lamb testified that everyone knew of the changes to the eligible accounts because of the Barber and Mooney report and recommendation. To later argue that *Page 24 
Frank DeMeo did not know or see the loan agreement defies logic.
 {¶ 55} Plaintiffs-appellants also argue that malpractice existed as to the Horizon lease, estate planning, and Frank DeMeo's personal guarantee of the loan. On April 17, 1991, Horizon and GCC entered into a lease agreement, which provided Horizon with a security interest in GCC's property. In January 2001, McDonald Hopkins was retained to prepare an amendment to the 1991 lease agreement between Horizon and GCC. McDonald Hopkins also assigned Kessinger to perform this task.
 {¶ 56} Kessinger testified that he reviewed the original lease and discussed the security interest with both Frank DeMeo and with GCC's general counsel, Geoffrey Lamb. Kessinger testified that GCC instructed him to delete Horizon's security interest in GCC's property.
 {¶ 57} Geoffrey Lamb testified that Horizon's security interest in GCC's property was deleted to effectuate the March 2001 loan agreement, which was integral to the restructure and mandated by Provident Bank to secure the loan. Lamb testified that as part of the restructuring, Provident Bank wanted a security interest in all of GCC's assets, thus Horizon's security interest was deleted.[18]
 {¶ 58} Based on the evidence before us, McDonald Hopkins did not commit legal malpractice because it was specifically instructed to delete Horizon's security *Page 25 
interest in GCC's property in order to facilitate GCC's obtaining the 2001 loan.
 {¶ 59} Lorraine DeMeo and GCC claim McDonald Hopkins committed legal malpractice by failing to advise the DeMeos that the transfer of the Hunting Valley and Naples properties from Frank DeMeo to Lorraine DeMeo could be viewed by Provident Bank as fraudulent transfers. However, Lorraine DeMeo and GCC make no argument on this issue in their appellate brief. We, therefore, decline to address this claim.[19] An appellate court may disregard an assignment of error pursuant to App. R. 12 and App. R. 16 when a party provides no argument on that assignment of error.[20]
 {¶ 60} On the issue of Frank DeMeo's personal guaranty of the 2001 loan agreement, the personal guaranty flowed from the Barber and Mooney recommendation. It appears from the record that Provident Bank was not going to agree to the 2001 loan without his personal assurance. This appeared to be the agreement of the parties because Frank DeMeo was in default of the 1998 loan; consequently, this cannot be held as a breach by McDonald Hopkins because DeMeo agreed to terms, which resulted in GCC obtaining the 2001 loan.
 {¶ 61} In their brief in opposition to the motion for summary judgment, *Page 26 
plaintiffs-appellants argue that causation is a fact question, citing two out-of-state cases.[21] We decline to follow this approach; proximate cause may be a legal question and subject to summary judgment. Proximate cause exists when the plaintiffs-appellants show that there is a casual connection between the conduct complained of and the resulting damage or loss.[22] When the plaintiffs fail to show this connection, summary judgment is warranted. Additionally, compensatory damages must be shown with certainty and damages which are merely speculative will not give rise to recovery.[23] "The evidence must establish a calculable financial loss because one of the essential elements of a legal malpractice claim is a causal connection between the conduct complained of and resulting damage or loss."[24]
 {¶ 62} In order for the plaintiffs-appellants to establish a fact question on proximate cause in light of Vahila, imbued in this concern one must ask the question in malpractice cases, what was the attorney hired to accomplish, perform, or *Page 27 
achieve? When the attorney performs his duty, the client cannot later claim foul unless the client's harm or injury is proximately caused by the lawyer's conduct.
 {¶ 63} In the instant case, plaintiffs-appellants argue that the 2001 loan agreement resulted in a lack of working capital resulting in GCC's inability to meet its financial commitments, and McDonald Hopkins's failure to discover that the definition of eligible accounts had changed resulted in a loss of dollars and the loss of DeMeo's life. McDonald Hopkins argues, and we agree, that no question of fact exists on this issue, because they cannot show that McDonald Hopkins is the legal and economic source of the plaintiffs-appellants' injury or loss.
 {¶ 64} We read Vahila's holding on causation as allowing for summary judgment when the facts are undisputed and susceptible of only one conclusion. Here, only one conclusion can be reached, which is that McDonald Hopkins's conduct did not cause plaintiffs-appellants' injury or loss.
 {¶ 65} In this case, it is undisputed that in 1999, GCC's financial condition was declining. Its profits went from $85 million to $65 million to $29 million. In 2000, when GCC sought additional money from Provident Bank, it was in default. In 1996, GCC and Provident Bank entered into the first loan where the parties agreed any change in eligibility was in the exclusive dominion of Provident Bank. In 1997, in the second loan, the parties mutually agreed that GCC could not draw on over-advanced notes. In 1998, another restructuring occurred, and GCC had no right to receive *Page 28 
over-advances.
 {¶ 66} By 1999, GCC was in need of more money. However, instead of following past practices, Provident Bank sought the recommendation of its consultant, Barber and Mooney. Barber and Mooney recommended the change in the eligible accounts, the Horizon Lease change, and Frank DeMeo's personal guarantee.
 {¶ 67} From the record, GCC, Frank DeMeo, and the Bank's representative had worked out a loan restructure in 2000. In 2001, McDonald Hopkins reviewed the documents and sent them to GCC for its approval. GCC's lawyer, Johnson, and DeMeo reviewed and approved the documents. Six months later, GCC was again in default.
 {¶ 68} The proximate cause of DeMeo and GCC's damages was the prevailing economic environment in GCC's industry. It appears from the record that Frank DeMeo and GCC, faced with the severe downturn in its industry, had no choice but to accept the restructured loan, which included the disputed definitional change to the eligible accounts. Accordingly, we conclude that where a client's malpractice claim is based on the attorney's failure to inform a client, the client must show that the information would have prevented the client's damages. Here, Frank DeMeo stated that he needed the loan to save the business. It was never about the waiver or about the failure to disclose; it was about the business. Accordingly, we overrule *Page 29 
plaintiffs-appellants' first assigned error.
 Statute of Limitations Defense and Legal Malpractice {¶ 69} In the second assigned error, Lorraine DeMeo and GCC argue the trial court erred in granting summary judgment, thereby dismissing their professional negligence claim based upon McDonald Hopkins's statute of limitations defense. Based on our disposition of the first assigned error in which we concluded that McDonald Hopkins did not commit legal malpractice in discharging their duties to the DeMeos and GCC, this assigned error is moot.
 Motion to Compel {¶ 70} We will address the third and fourth assigned errors together because they encompass similar propositions of both fact and law. In the third and fourth assigned errors, Lorraine DeMeo and GCC argue the trial court erred in denying their motion to compel McDonald Hopkins to identify the names of attorneys and the files they worked on for Provident Bank spanning the years 1995 through 2005. We disagree.
 {¶ 71} A trial court is vested with discretion in rendering decisions on discovery matters.[25] Our standard of review for decisions on motions to compel is *Page 31 
the abuse of discretion standard.[26] To show an abuse of discretion, the complaining party must show that the judge's actions were "unreasonable, arbitrary, or unconscionable."[27]
 {¶ 72} The evidence presented in the case at bar demonstrates that the trial court's actions were not unreasonable, arbitrary, or unconscionable. The record indicates that on November 18, 2005, Lorraine DeMeo and GCC filed a motion to compel discovery. The discovery request at issue stated in pertinent part as follows:
 "Please produce a listing of all open files from 1995 to present, including case names, file numbers, any names of attorneys and/or staff members working on or responsible for the file, associated with the provision of legal services by Defendant McDonald Hopkins to Defendant Provident Bank."
 {¶ 73} Lorraine DeMeo and GCC also propounded a similar request to National City Bank, Provident Bank's successor. Lorraine DeMeo and GCC argued that the information was necessary to determine the extent of McDonald Hopkins's conflict of interest in simultaneously representing the parties.
 {¶ 74} McDonald Hopkins objected on the grounds that the request was vague, over-broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. McDonald Hopkins also objected on the grounds *Page 31 
that the request called for information protected by the attorney-client privilege.
 {¶ 75} Nonetheless, McDonald Hopkins produced a list of attorneys who worked on Provident Bank related matters from January 2001 through December 2002, along with the dates of services, as well as client and matters numbers. The information produced spanned the time frame in which McDonald Hopkins represented GCC in its negotiations with Provident Bank to restructure the 1996 loan agreement. Thereafter, McDonald Hopkins filed a motion for a protective order, which the trial court granted.
 {¶ 76} In the instant case, we find that the trial court's decision denying the motion to compel and granting McDonald Hopkins's motion for a protective order was proper. The discovery requests, which included all open and closed cases involving McDonald Hopkins's relationship with Provident Bank spanning a ten-year period, was unduly burdensome given that McDonald Hopkins represented Frank DeMeo and GCC from March 2001 through December 2002, a period of less than two years. Civ. R. 26(C) authorizes the trial court to issue a protective order where necessary to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[28]
 {¶ 77} Further, the request included files which would have reflected the names and other confidential information of Provident Bank's non-party borrowers. *Page 32 
In deciding whether to grant a protective order, the trial court must balance the competing interests to be served by allowing discovery to proceed against the harm which may result.[29]
 {¶ 78} Moreover, we have concluded that Frank DeMeo and GCC were aware from the outset that McDonald Hopkins had a prior and continuing involvement with Provident Bank dealing with unrelated matters. As such, we find no evidence that the trial court abused its discretion in denying Lorraine DeMeo and GCC's motion to compel and granting McDonald Hopkins's motion for protective order. Accordingly, we overrule the third and fourth assigned errors.
 Breach of Fiduciary Duty {¶ 79} In the fifth assigned error, Lorraine DeMeo and GCC argue the trial court erred in granting summary judgment, thereby dismissing their breach of fiduciary duty claim, based upon McDonald Hopkins's claim that it is subsumed by the legal malpractice claim. We disagree.
 {¶ 80} The elements of breach of fiduciary duty are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom."[30] *Page 33 
 {¶ 81} Having concluded in the first assigned error that McDonald Hopkins was not the proximate cause of GCC's business failure, we also conclude Lorraine DeMeo and GCC have failed to demonstrate that McDonald Hopkins breached any duty it owed to them. As such, the trial court properly granted summary judgment in favor of McDonald Hopkins on Lorraine DeMeo and GCC's breach of fiduciary duty claims. Accordingly, we overrule the fifth assigned error.
 Judgment on the Pleadings {¶ 82} In the sixth assigned error, Lorraine DeMeo and GCC argue that the trial court erred when it granted McDonald Hopkins's motion for partial judgment on the pleadings. We disagree.
 {¶ 83} Under Civ. R. 12(C), dismissal is appropriate where a court (1) construes the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt, that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief.[31]
When an appeal stems from a trial court's granting of a motion for judgment on the pleadings, an appellate court conducts a de novo review of the *Page 34 
legal issues without deference to the trial court.[32]
 {¶ 84} In the instant case, Lorraine DeMeo and GCC alleged in the amended complaint that as a proximate result of McDonald Hopkins's professional negligence and breach of fiduciary duty, they sustained economic loss, as well as mental and emotional anguish specifically as a result of Frank DeMeo's suicide. In the legal malpractice context, we have previously held that compensatory damages may be awarded for mental suffering, anguish, and humiliation where they are sustained as the result of wrongful, intentional and willful conduct.[33] Having concluded in the first assigned error that McDonald Hopkins was not the proximate cause of GCC's business failure, we also conclude that McDonald Hopkins's legal representation was not the proximate cause of the mental and emotional anguish alleged in the amended complaint.
 {¶ 85} Based on the foregoing, the trial court properly granted McDonald Hopkins's motion for partial judgment on the pleadings. Accordingly, we overrule the sixth assigned error.
Judgment affirmed.
It is ordered that appellees recover of appellants their costs herein taxed. *Page 35 
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, P.J., and MARY EILEEN KILBANE, J., CONCUR
[1] Kessinger Depo. at 53-54.
[2] See Giulioli Depo. at 140.
[3] Giulioli Depo. at 39-40.
[4] Johnson Depo. at 151-152.
[5] Kessinger Depo. at 43-44.
[6] Johnson Depo. at 149.
[7] Johnson Depo. at 158-159.
[8] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddy v. TheWedding Party, Inc. (1987), 30 Ohio St.3d 35; Northeast Ohio Apt. Assn.v. Cuyahoga Cty. Bd. of Commrs. (1997), 121 Ohio App.3d 188.
[9] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[10] Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
[11] Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107.
[12] Id. at 293.
[13] Bar Assn. of Greater Cleveland v. Shillman (1980),61 Ohio St.2d 364, 367.
[14] Cincinnati Bar Assn. v. Schwartz (1996), 74 Ohio St.3d 489, citing Shillman.
[15] (1989), 61 Ohio App.3d 506.
[16] Id. at 512.
[17] Krahn v. Kinney (1989), 43 Ohio St.3d 103, 105; see, also,McInnis v. Hyatt Legal Clinics (1984), 10 Ohio St.3d 112; Loveman v.Hamilton (1981), 66 Ohio St.2d 183; Harter v. Morris (1869),18 Ohio St. 493.
[18] Lamb Depo. at 101.
[19] See App. R. 16(A)(7); App. R. 12(A)(2); Love v. Pope (July 14, 2000), 6th Dist. No. L-99-1349.
[20] Dickenson v. Hartwig, 6th Dist. Nos. L-03-1085, L-03-1148, 2004-Ohio-1330.
[21] Woodruff v. Tomlin (6th Cir., 1980), 616 F.2d 924;Paul v. Smith, Gambrell Russell (April 14, 2004),267 Ga. App. 107.
[22] Vahila v. Hall, 77 Ohio St.3d 421, 1997-Ohio-259.
[23] Endicott v. Johrendt (June 22, 2000), 10th Dist. No. 99AP-935, accord Nu Trend Homes, Inc. v. Law Offices of De LiberiaLyons and Bibbo, 10th Dist. No. 01AP-1137, 2003-Ohio-1633, ¶ 42.
[24] Nu-Trend Homes, supra at ¶ 42, citing Motz v. Jackson (June 29, 2001), 1st Dist. No. C-990644.
[25] Dandrew v. Silver, Cuyahoga App. No. 86089, 2005-Ohio-6355, citing Mauzy v. Kelly Services, Inc., 75 Ohio St.3d 578, 592,1996-Ohio-265.
[26] Wolnik v. Matthew J. Messina, DDS, Inc., Cuyahoga App. No. 88139,2007-Ohio-1446, citing Folmar v. Griffin, Delaware 5th
Dist. No. 2005CAE080057, 2006-Ohio-1849.
[27] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217.
[28] Werner v. McAbier (Jan. 13, 2000), Cuyahoga App. Nos. 75197 and 75233.
[29] Alpha Benefits Agency, Inc. v. King Ins. Agency, Inc. (Sept. 2, 1999), Cuyahoga App. No. 74623, citing Arnold v. Am. Natl. Red Cross
(1994), 93 Ohio App.3d 564, 576.
[30] Miller v. KeyBank N.A., Cuyahoga App. No. 86327, 2006-Ohio-1725, quoting Harwood v. Pappas Assoc., Inc., Cuyahoga App. No. 84761,2005-Ohio-2442, at ¶ 26, citing Strock v. Pressnell (1988),38 Ohio St.3d 207, 216.
[31] Drozeck v. Lawyer Title Ins. Corp. (2000),140 Ohio App.3d 816.
[32] Ferchill v. Beach Cliff Bd. of Trustees, 162 Ohio App.3d 144,2005 Ohio 3475.
[33] Cunningham v. Hildebrand (2001), 142 Ohio App.3d 218, citingDavid v. Schwarzwald, Robiner, Wolf Rock Co., L.P.A. (1992),79 Ohio App.3d 786, 801. *Page 1